And we'll hear argument in our final case today in Pryor v. Commissioner of Social Security, 16-9-1-7. Good morning, Judge. My name is Ronald Pryor. Mr. Pryor, hold on one second. I'll let you know when you can start. You've reserved three minutes for rebuttal, is that correct? Yeah. So you can proceed. Okay. Good afternoon, Judges. My name is Ronald Pryor. I'm the plaintiff. This case was based, started out as an overpayment. I was in front of Judge John Barry at the Juvenile Security Office. I think that was on May 31st of 2013. My arguments with Judge Barry's decision is that, for what I've read, that he sent a verification letter to a company that I don't even know, Hawking Systems, which I don't know nothing about. They identified me by some kind of an ID, copy of an ID. Okay. I got the decision back, which, let me go back. He should have brought someone from payroll to be on the record to testify that if this is me or not, which he didn't. Okay. So when I got the decision, it was unfavorable. Okay. Within his decision, he said I can appeal it at the Appeals Council, 60 days, which I did in a timely fashion. While I was pending at the Appeals Council, January 9th of 2013, I was coming out of my house. Four police officers came up to my house, which I did not know. I said, was I Ronald Pryor? I said, yes. You have to come with us. Okay. I had to take my cell phone, put it up in my apartment, and they took me down. And while I was in the van, I asked them, why was I being arrested? They said, well, Social Security says that you are working and collecting benefits. I said, well, no. Well, you still got to come to us. You got to come with us. So they didn't put me in handcuffs. They took me down to Queens Boulevard to their office. Locked me up in jail. I stayed there for about close to a whole day. Then they put me in handcuffs, took me down to Queens Central Booking. Bear in mind, this is while the case was pending at the Appeals Council. Okay. I stayed in the Central Booking for about a whole day. The attorney that represented me at the Queens Criminal Court was Jennifer Norman. Mr. Pryor. Yes, sir. So, Joe DeStand, you have an appeal. You made a specific argument about your earnings at this company. Right. Well, they made the issue. They made the issue that I made $15,922 earnings. And you claimed that you – I never heard of it. I never worked there. I never worked there. I don't know nothing about it. Well, but you were there on a day when, just coincidentally, their investigators showed up. You weren't in the booth operating the – No. That was downstate parking lot. That was not parking system, which is in the record there. If I have copies of – So you dispute the record and the – Oh, sure. Oh, sure. Because I was – like I stated in my record that I was relieving a friend of mine. He went to – what do you call it? To get some lunch. All right? I stood there. I didn't feel nothing was wrong with it. So during the time that I was there, two people, male and a female, came up and asked me was I Ron Pryor. I said yes. All right. The lawyer for the commissioner is going to get up. Sure. And you'll have three minutes. Listen carefully to what she says. And if you've got responses, then you'll have that time to respond. Good afternoon, Your Honors. I'm Candace Appleton, and I'm here representing the acting commissioner of Social Security. Despite Mr. Pryor's claims to the contrary, the facts in this case are relatively straightforward. Substantial evidence in the record demonstrates clearly that while receiving Social Security disability benefits in 2008, he worked and earned $15,922.54. Pryor says it's a different lot. He says it's a different lot, but my assumption is that somebody who works for the Social Security Administration Office of the Inspector General, when they go on a stakeout or a surveillance, went to a parking lot that was, in fact, although it is used for the hospital, it is, in fact, run by parking systems. That's what a parking system does. It subcontracts with different facilities to run. And it would be awfully ironic that he happened to be there that day. And in an affidavit to the district court, he said it was a parking systems facility, and that he just so happened to be there, admitted that he got his picture taken, admitted that he met the investigator, and that he was just covering for somebody going to lunch. I mean, the facts in this case are very clear. I think there are six major ones. Five of them, I think, were before the administration. And then the last one, Mr. Pryor himself submitted to the federal court that he did admit that he was at that parking lot when the investigator was there. May I ask something that's a little unclear to me in the record? And it may be not in the record because it's not necessarily relevant. But there is some reference to prior years in which there were earnings reported for Mr. Pryor to the IRS. And he maintained on those occasions also that this was not him and it was identity theft, and the Social Security Administration did not proceed against him for those years. Is that accurate? I cannot speak specifically to that. All I know that in the record he submitted there was a 2008 administrative law judge decision on his continuing disability. The issue there was not per se was he working, and none of the 2008 employment records were given to Social Security. That was just a standard medical assessment. That was a continuing disability review, yes. And there was no specific finding about wages in 2008 made. That is the sole issue here. Did he work in 2008? Is there anything further, Ms. Huffington? No, I would stand. I think the six areas, we have the employment, we have the Social Security records, earnings records are very clear. IRS obviously reported to them. And a lot of the other evidence, interestingly enough, Mr. Pryor put in himself and assisted our case, just that there's substantial evidence that he did work in 2008. Mr. Pryor, you've got three minutes. Well, I don't know if there's sufficient evidence. As I said before, this is parking systems. I mean, the Vice President could be there, but this is actually downstate hospital parking lot. It's not parking systems. I don't know what they have with downstate. It's not my concern. But the lot that the agents saw me at was downstate hospital parking lot. And if you check the record, which I submitted in, it states it. It states it. It's 225 belongs to the state. Now, it's not my word. It's submitted of it. And I submitted it to the record. So no matter what they say, it belongs to the state. Simple. That's what it is. And they can assume anything they want. But if I just came up here and verbalized it and had proof of it, it would be like her. But here's the proof. 225 is one among other lots, belongs to downstate hospital. And downstate hospital in Brooklyn is run by the state. Thank you. Thank you very much. We'll reserve the decision. That concludes today's regular argument calendar. And we are adjourned.